U.S. DISTRICT COURT
N.D. OF N.Y.
FILED

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

JUN 2 4 2016

LAWRENCE K. BAERMAN, CLERK
ALBANY

**UNITED STATES OF AMERICA** *ex rel.*
**DEBRA MCGEEHAN,**

**QUI TAM COMPLAINT**
**AND**
**DEMAND FOR A JURY TRIAL**

*Plaintiff,*

*v.*

**GATEWAY FUNDING DIVERSIFIED MORTGAGE**
**SERVICES, L.P. n/k/a FINANCE OF AMERICA**
**MORTGAGE LLC,**

**FILED UNDER SEAL**
**PURSUANT TO**
**31 U.S.C. §§ 3729** *et seq.*

**Civil Action No.**

1:16·cv-750
(LEK/CFH)

*Defendant.*

Relator Debra McGeehan ("McGeehan") brings this qui tam action in the name of the

United States of America, by and through her undersigned attorneys Thomas & Solomon

LLP, and alleges as follows:

## INTRODUCTION

1.      This is a civil fraud action by qui tam Relator Debra McGeehan on behalf of

the United States ("the Government"), against Gateway Funding Diversified Mortgage

Services, L.P. n/k/a Finance of America Mortgage LLC ("Gateway" or "Defendant") to recover

treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733, for

damages sustained by the United States Department of Housing and Urban Development

("HUD"), the Federal Housing Administration ("FHA"), and the United States Department

of Veteran Affairs ("VA") in connection with Gateway's origination, underwriting, and

quality control of residential mortgage loans under the FHA and VA loan programs.

2.      Gateway, a lender approved by HUD and the VA to originate and underwrite

single-family residential mortgages insured by HUD and the VA, knowingly approved loans

that violated FHA and VA rules while falsely certifying compliance with those rules.

3.     Before Gateway could approve FHA and VA loans for insurance, Gateway was required to confirm that the loan met the underwriting requirements applicable to FHA and VA loans.    Notwithstanding this requirement, Gateway routinely approved loans for government insurance that clearly did not meet the applicable underwriting requirements. Gateway submitted loans that had multiple material deficiencies and violations of the underwriting requirements, including instances where underwriters manipulated income, credit, and assets in order to allow a loan to be approved, or where Gateway's management would waive material conditions in order to allow the loan to be approved.

4.     Gateway sought to approve as many government loans as possible by incentivizing quantity over quality.   Gateway instructed its underwriting staff that loan applications should never be declined and that Gateway's motto was "just do it," meaning that employees were to do "whatever it takes" to get loans approved.

5.     Gateway also utilized a wholesale loan department that was designed to approve as many government loans as possible. The brokers that Gateway did business with would routinely offer Gateway's underwriters $100 for each loan they approved, even though such kickbacks were in obvious violation of the government rules and regulations.

6.     As part of its ability to self-endorse government loans, Gateway was also required to perform quality control on a subset of loans that had been approved for insurance and to self-report to the government any loans that had serious errors or violations of the underwriting rules.  This self-reporting requirement is meant to enable HUD and the VA to investigate bad loans and to request reimbursement or indemnification from lenders.

7.     Despite this fundamental and basic requirement to implement a quality

control process, Relator is aware that Gateway did not develop a quality control process until approximately 2013.

8.     As a result of this serious neglect, prior to 2013, upon information and belief, Gateway never reviewed and self-reported errors with loans prior to 2013 and thus concealed its errors and shoddy underwriting practices from being identified by the government.

9.     Gateway also used several improper underwriting tactics to approve loans that were not eligible for government insurance.  For instance, Gateway manipulated the TOTAL Mortgage Scorecard ("TOTAL") — a credit-rating algorithm maintained by the FHA that works in conjunction with Gateway's automated underwriting system ("AUS") to obtain "accept/approve" ratings for its FHA loans, in violation of HUD rules.  TOTAL rates loans as either "accept/approve" or "refer" based on data points that Gateway enters into its AUS, including, for example, the dollar value of the borrowers' income and assets.  Loans that receive an "accept/approve" rating are subject to less stringent documentation requirements and underwriter scrutiny than loans that receive a "refer" rating.

10.     In order to ensure that loans would only generate "accept/approve" ratings, Gateway instructed its mortgage loan officers to change data points, such as the borrower's income or debt obligations, that were entered into the TOTAL system.  Gateway would have the loan officers repeatedly enter into AUS/TOTAL hypothetical data points that would allow the loan to receive an "accept/approve" rating.

11.     Once the loan generated such a rating, Gateway would communicate to its underwriting staff that they needed to "make it work."  This referred to Gateway's need to make the loan calculations match the desired variable(s) that would result in an "accept/approve" rating.

12.   In order to "make it work," Gateway taught and counseled underwriting staff on several mechanisms to fraudulently obtain the variables needed to generate an "accept/approve" rating.   These tactics included intentionally miscalculating borrowers' income and debt obligations, and failing to properly analyze a borrower's creditworthiness and assets.

13.   As a result of its reckless underwriting practices and explicit instructions to skirt the government regulations, the government loans that Gateway underwrote? regularly contained material deficiencies.   These errors were only compounded by the fact that since Gateway did not have a quality control system in place until approximately 2013, Gateway never notified its underwriting staff of these deficiencies or made any efforts to fix these errors.   In fact, Gateway cared so little about the government's regulations that it did not bother to even provide updates or training to underwriting staff regarding the rules and guidelines for FHA and VA loans during this time.

14.   Gateway nonetheless certified that all of the loans that it approved for government insurance met all of the underwriting, origination, and quality control requirements applicable to FHA/VA loans.   These false certifications misled HUD and the VA into believing that Gateway's loans had been properly underwritten and were eligible for government insurance when, in fact, the loans were high risk and did not qualify for such insurance.

15.   Gateway's conduct allowed it to profit from these loans, even if the borrowers defaulted on their mortgages.   As the risk was entirely on FHA and the VA when the non-compliant loans inevitably defaulted, this materialized into millions of dollars in losses to HUD and the VA.

16.     Ineligible loans endorsed by Gateway have resulted in millions of dollars in existing losses to the government and many additional loans are currently in default and will likely result in significant additional losses to HUD and the VA.   Furthermore, the government's underwriting requirements are designed not only to protect it and the taxpayers from improperly underwritten and unduly risky loans, but also to ensure that creditworthy borrowers are able to handle the monthly payments and to become lasting homeowners. Gateway's underwriting of ineligible loans and false certifications of compliance with applicable requirements undermined these objectives, harming homeowners and the housing market.

## JURISDICTION AND VENUE

17.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3733.   This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3732, conferring jurisdiction for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730, and pursuant to 28 U.S.C. § 1331, conferring jurisdiction over all civil actions arising under the laws of the United States.

18.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Gateway transacts significant business in this judicial district, and acts proscribed by 31 U.S.C. 3729 have been committed by Defendants in this District.

19.     Upon information and belief, Gateway has underwritten government loans for properties located within this District and endorsed loans for FHA insurance that have defaulted within this District.

20.     Therefore, venue is proper within the meaning of 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a).

21.     This suit is not based on prior public disclosure of allegations or transactions in

a criminal, civil or administrative hearing, lawsuit or investigation; in a Government Accountability Office or Auditor General's report, hearing, audit, investigation; in the news media; or otherwise as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4), but upon rather information from Relator.

22.     In the alternative, to the extent there has been a public disclosure unknown to Relator, Relator is an original source as defined by the FCA.   Relator has direct and independent knowledge of Gateway's fraudulent activities.   Relator has also voluntarily provided this information to the Government prior to filing this action as required under 31 U.S.C. § 3730(e)(4)(B).

23.     Relator shall serve on the United States a copy of this Complaint and a written disclosure statement setting forth and enclosing all material evidence and information she possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

## THE PARTIES

24.     Upon information and belief, during relevant times, Defendant Gateway Funding Diversified Mortgage Services, L.P. was a Pennsylvania limited partnership having a principal place of business of Horsham, Pennsylvania.

25.     Upon information and belief, Finance of America Mortgage LLC purchased Gateway Funding Diversified Mortgage Services, L.P. in approximately August 2015.

26.     Finance of America Mortgage LLC has a principal place of business of 300 Welsh Road, Building 5, Horsham, Pennsylvania, 19044.

27.     Relator is a resident of Warminster, Pennsylvania and previously worked for Gateway as an FHA and VA underwriter from approximately April 2009 to October 2011, and from July 2012 to January 2015.

28.     Through her past work experiences and education, Relator has extensive knowledge of the rules and regulations applicable to FHA loans.

## FACTUAL BACKGROUND

### Civil Statutes to Combat Mortgage Fraud

29.     The False Claims Act provides that a person is liable to the United States Government for each instance in which the person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(l) (2006); 31 U.S.C. § 3729(a)(l)(A) (2010).

30.     The False Claims Act also makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(l)(B) (2010). The prior version of the false statements provision made liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. §3729(a)(2) (2006).

31.     The Act defines "knowingly" to mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information" 31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(I)(A) (2010). The False Claims Act provides that no proof of specific intent to defraud is required. 31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(l)(B) (2010).

32.     Before May 2009, the False Claims Act defined the term "claim" to include "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides

any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c)(2006).

33.     Effective May 20, 2009, the False Claims Act now defines the term "claim" to mean, in relevant part: "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that: (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A) (2010).

34.     The Supreme Court has made clear that a request for payment made under a federal loan guarantee that was obtained in violation of a statute, regulation, or program requirement, by the use of a false statement, or by means of other fraudulent conduct qualifies as a "claim" under the False Claims Act. *See United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

35.     Any person who violates the False Claims Act is liable to the United States Government for a civil penalty of not less than $5,500and not more than $11,000, plus 3 times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729(a)(I).

## HUD's FHA MORTGAGE INSURANCE PROGRAM

*Background*

36.     HUD is a cabinet-level agency of the United States. Its mission is to create strong, sustainable, inclusive communities and quality affordable homes for all. HUD works to strengthen the housing market to bolster the economy and protect consumers, meet the need for quality affordable rental homes, utilize housing as a platform for improving quality of life, and build inclusive and sustainable communities free from discrimination.

37.     FHA is a part of HUD and is one of the largest mortgage insurers in the world. Pursuant to the National Housing Act of 1934, FHA offers several mortgage insurance programs that have insured more than 40 million home loans since FHA's inception. Through some of these mortgage insurance programs, FHA provides insurance against losses on mortgage loans to single family homebuyers originated and held by approved lenders, or mortgagees.

38.     If a homeowner defaults on an FHA-insured mortgage, the holder of the mortgage may submit a claim to HUD. HUD will then pay the mortgage holder the outstanding balance on the loan and other costs associated with the default. The mortgage holder therefore suffers no loss when a borrower is unable to repay an FHA-insured mortgage. This no-loss guarantee encourages lenders to make loans to creditworthy applicants who would otherwise have difficulty qualifying for conventionally available financing on favorable terms, including the ability to put little money down to make the purchase. FHA mortgage insurance programs therefore help many creditworthy low- and moderate-income families as well as first-time homebuyers become homeowners.

39.     A lender must apply to be a Direct Endorsement Lender and must be approved

by HUD to underwrite FHA-insured mortgage loans on HUD's behalf. This is an important responsibility because HUD "does not review applications for mortgage insurance before the mortgage is executed." 24 C.F.R. § 203.5(a).   Instead, the Direct Endorsement Lender underwrites mortgage loans on HUD's behalf and determines whether a borrower presents an acceptable credit risk for HUD. In underwriting the mortgage loan, the lender must determine whether the borrower and the mortgage loan meet HUD's requirements for FHA insurance and whether the "proposed mortgage is eligible for insurance under the applicable program regulations." *Id.* The Direct Endorsement Lender must decide whether or not to approve the borrower for an FHA-insured mortgage loan.

40.   After the Direct Endorsement Lender approves a borrower for an FHA-insured mortgage loan, the lender may submit the mortgage loan to HUD to "endorse" the mortgage loan for FHA insurance, meaning that the mortgage loan is fully insured by the FHA insurance fund in the event that the borrower cannot repay the loan. The Direct Endorsement Lender must certify that the loan meets all of HUD's requirements and HUD relies on this certification to endorse the loan for FHA insurance.

41.   Certain Direct Endorsement Lenders apply to, and participate in, the Lender Insurance program in which the mortgagees themselves endorse the mortgage for FHA insurance and retain all documentation supporting the mortgage. 24 C.F.R. § 203.6. The lender retains the documents necessary to approve the loan (the FHA "case binder") and remits the documents to HUD only upon request. *See* Mortgagee Letter 2005-36.

42.   A Direct Endorsement Lender is expected and obligated to act with the utmost good faith, honesty, and fairness in its dealings with HUD. "Under the . . . civil case law the mortgagee, knowing that the federal insurer is 'relying on its professional judgment in a

business relationship' has an affirmative duty 'to use due care in providing information and advice' to the federal mortgage guarantor." *United States v. Bernstein*, 533 F.2d 775, 797 (2d Cir. 1976) (citing *First Nat'l Bank Henrietta v. Small Bus. Admin.*, 429 F.2d 280, 287 (5th Cir. 1970); *Mt. Vernon Coop. Bank v. Gleason*, 367 F.2d 289, 293 (1st Cir. 1966)). As a result, in addition to the regulatory duties addressed below, the Direct Endorsement Lender owes both a fiduciary duty and a duty of reasonable care to HUD.

### HUD's Direct Endorsement Program

43. The success of the Direct Endorsement Program depends upon proper underwriting of loan files. Participating lenders have to determine the eligibility of borrowers and loans for FHA insurance, and ensure the integrity of the data relied upon to make such determinations.

44. Under the Direct Endorsement Program, HUD relies on the expertise and knowledge of the lenders.

45. HUD also relies on the truthfulness of the certification the lender completes on each loan certifying that the loan is eligible for FHA insurance. As HUD has explained, these "certifications are important as HUD will rely upon them for purposes of endorsing the mortgage loan, thereby eliminating the necessity for a detailed HUD review of the loan prior to endorsement." Final Rule, Mutual Insurance Programs Under the National Housing Act; Direct Endorsement Processing, 48 Fed. Reg. 11928, 11932 (March 22, 1983).

46. To obtain and maintain its status as a Direct Endorsement Lender, a lender must have qualified underwriters on staff.

47. To qualify as a Direct Endorsement underwriter or "DE underwriter," an underwriter must satisfy several requirements. The DE underwriter "must have a minimum

of three years full-time recent experience (or equivalent experience) reviewing both credit applications and property appraisals." HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.A.3; *see also* HUD Handbook 4155.2 ch. 2.A.4.a. The underwriter must also be a "reliable and responsible professional skilled in mortgage evaluation" and "must be able to demonstrate his or her knowledge and experience regarding the principles of mortgage underwriting." HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.A.1; *see also* HUD Handbook 4155.2 ch. 2.A.4.a.

48.     A Direct Endorsement Lender is responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the mortgage. That responsibility includes performing due diligence and ensuring accuracy.

### The FHA's Due Diligence Requirements

49.     Proper due diligence is a critical component of the Direct Endorsement Program. It is required by federal regulation and HUD Handbooks. It is also required by virtue of the fiduciary duty and duty of reasonable care that the Direct Endorsement Lenders owe to HUD. *See* 48 Fed. Reg. at 11932 ("The duty of due diligence owed [HUD] by approved mortgagees is based not only on these regulatory requirements, but also on civil case law."). "The entire scheme of FHA mortgage guaranties presupposes an honest mortgagee performing the initial credit investigation with due diligence and making the initial judgment to lend in good faith after due consideration of the facts found." Bernstein, 533 F.2d at 797.

50.     A lender's due diligence should (1) "determine a borrower's ability and willingness to repay a mortgage debt, thus limiting the probability of default and collection difficulties"; and (2) "examine a property offered as security for the loan to determine if it provides sufficient collateral." HUD Handbook 4155.1, REV-5, ch. 2-1. Proper due diligence

thus requires an evaluation of, among other things, a borrower's credit history, capacity to pay, cash to close, and collateral. Id.

51.   In all cases, a Direct Endorsement Lender owes HUD the duty, as prescribed by federal regulation, to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment." 24 C.F.R § 203.5(c).

52.   HUD has established specific rules for due diligence predicated on sound underwriting principles.   In particular, HUD requires Direct Endorsement Lenders to be familiar and to fully comply with governing HUD Handbooks and Mortgagee Letters, which provide detailed instructions and requirements for Direct Endorsement Lenders. These requirements set forth "the minimum standard of due diligence in underwriting mortgages" with which Direct Endorsement Lenders must comply. Id.

53.   HUD considers the Direct Endorsement underwriter to be "the focal point of the Direct Endorsement program."  HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.C. The Direct Endorsement underwriter must assume the following responsibilities:

- compliance with HUD instructions, the coordination of all phases of underwriting, and the quality of decisions made under the program;

- the review of appraisal reports, compliance inspections and credit analyses performed by fee and staff personnel to ensure reasonable conclusions, sound reports and compliance with HUD requirements;

- the decisions relating to the acceptability of the appraisal, the inspections, the buyer[']s capacity to repay the mortgage and the overall acceptability of the mortgage loan for HUD insurance;

- the monitoring and evaluation of the performance of fee and staff personnel used for the Direct Endorsement program;

- and awareness of the warning signs that may indicate irregularities, and an

- 13 -

ability to detect fraud, as well as the responsibility that underwriting decisions
are performed with due diligence in a prudent manner.

*Id.*

54.    The underwriter must "evaluate the mortgagor's credit characteristics, adequacy
and stability of income to meet the periodic payments under the mortgage and all other
obligations, and the adequacy of the mortgagor's available assets to close the transaction, and
render an underwriting decision in accordance with applicable regulations, policies and
procedures." 24 C.F.R. § 203.5(d).

55.    When ensuring that a borrower is creditworthy, a Direct Endorsement Lender
must comply with governing HUD requirements, such as those set forth in HUD Handbook
4155.1 (Mortgage Credit Analysis for Mortgage Insurance on One- to Four-Unit Mortgage
Loans).    The rules set forth in HUD Handbook 4155.1 exist to ensure that a Direct
Endorsement Lender sufficiently evaluates whether a borrower has the ability and willingness
to repay the mortgage debt. HUD has informed Direct Endorsement Lenders that past credit
performance serves as an essential guide in determining a borrower's attitude toward credit
obligations and in predicting a borrower's future actions.

56.    Direct Endorsement Lenders can underwrite an FHA-insured loan in one of
two ways. First, a DE underwriter can "manually underwrite" the loan, by making the credit
decision whether to approve the borrower, in accordance with HUD underwriting rules.
Second, the Direct Endorsement Lender can use a HUD-approved Automated Underwriting
System (AUS), a software system that makes the credit recommendation whether to approve
the borrower.

57.    To "manually underwrite" an FHA-insured loan, there are numerous steps the
DE underwriter must take.  At a minimum, the underwriter must: (1) obtain and review the

borrower's credit history; (2) obtain adequate explanations for major derogatory credit, including collections, judgments, and other recent credit problems; (3) analyze the borrower's debt obligations; (4) reject documentation transmitted by unknown or interested parties; (5) inspect documents for proof of authenticity; (6) verify the borrower's employment history; (7) establish the borrower's income stability and make income projections; (8) ensure that the borrower has invested a minimum required amount of his or her own funds in the transaction; (9) document the source of funds invested in the transaction, including any gift funds; (10) calculate debt and income ratios and compare those ratios to the fixed ratios set by HUD rules; and (11) consider and document any compensating factors permitting deviations from those fixed ratios. *See* HUD Handbook 4155.1.

### Underwriting of Loans with the FHA's TOTAL System

58.     Beginning in July 2008, HUD required Direct Endorsement Lenders to electronically process eligible loan requests through an AUS. The AUS is a software program that connects to a proprietary HUD algorithm known as Technology Open to Approved Lenders, or "TOTAL." Using the data the lender inputs, HUD's "TOTAL" algorithm makes a credit determination and either: (i) provides an "Accept/Approve" decision, approving the loan subject to certain conditions; or (ii) provides a "Refer" decision, referring the loan back to the lender for manual underwriting. When TOTAL approves the loan, the approval is conditioned on the lender completing certain additional underwriting steps. Many of these conditions relate to ensuring the data the lender entered is true, complete, and accurate.

59.     Numerous requirements promulgated by HUD explain how lenders must calculate each data point and what documentation they need to support each data point.

60.     For any loan approved through the use of an AUS, HUD requires the lender to

certify to the integrity of the data it entered, which HUD defines as data that is true, complete, and accurate. FHA TOTAL Mortgage Scorecard User Guide (December, 2004 Edition), ch. 2. If the lender later receives or learns of information that materially differs from the information previously entered by the lender, the lender must re-submit a proposed loan to TOTAL through the AUS.

61.     The data entered into TOTAL is material to the endorsement of the loan because TOTAL is an algorithm that evaluates the overall creditworthiness of a mortgage applicant based on the data supplied by the lender.  Therefore, a loan receiving a TOTAL "Accept/Approve" decision is only eligible for FHA's insurance endorsement if "the data entered into the AUS are true, complete, properly documented, and accurate." *See* FHA TOTAL Mortgage Scorecard User Guide (December, 2004 Edition), ch. 2. It is the Direct Endorsement Lender's responsibility to ensure the integrity of the data relied upon by TOTAL. *See* Mortgagee Letter 2004-1.

62.     Because TOTAL cannot analyze data that is not available to it, certain loans are not eligible for an AUS approval and must be manually underwritten.  "A manual downgrade becomes necessary if additional information, not considered in the AUS decision, affects the overall insurability or eligibility of a mortgage otherwise rated as an accept or approve." FHA TOTAL Mortgage Scorecard User Guide (December, 2004 Edition), ch. 2. While a lender is not required to have a Direct Endorsement underwriter review the credit portion of an AUS approved loan, a lender must have qualified staff review AUS approvals to ensure a loan that receives an "Accept/Approve" decision is in fact eligible for an AUS approval. *See id.*

63.     To ensure the integrity of TOTAL's decision, as well as the integrity of the data

TOTAL relies upon, lenders are prohibited from "willfully manipulating ... application variables [in] TOTAL mortgage scorecard to obtain an accept/approve risk classification." *See* Mortgagee Letter 2005-15.

64.    If TOTAL does not approve a loan with an "Accept/Approve" decision, it returns a "Refer" decision, meaning the loan is referred back to the lender for manual underwriting.  Lenders must then have a DE underwriter perform a manual underwrite and determine if the loan is approvable under FHA's manual underwriting requirements.  *See* 24 C.F.R § 203.255(b)(5)(i)(B).

### FHA's Requirements of a Quality Control Program and Mandatory Reporting

65.    A Direct Endorsement Lender is required to maintain a quality control program to ensure the quality of its FHA-insured mortgages.  HUD requires that "[t]he Quality Control function must be independent of the [lender's] origination and servicing functions."  HUD Handbook 4060.1, REV-2, ch. 7-3.B; *see also* HUD Handbook 4700.2, REV-1, ch. 6-1.A.

66.    The quality control program must be designed to meet the goals of assuring compliance with FHA's requirements, protecting FHA from unacceptable risk, guarding against errors, omissions and fraud, and assuring swift and appropriate corrective action. HUD Handbook 4060.1, REV-2, ch. 7-2.   The quality control program also must review a sample of all closed loan files to ensure they were underwritten in accordance with HUD guidelines.  HUD Handbook 4060.1, REV-2, ch. 7-6.C; *see also* HUD Handbook 4700.2, REV-1, ch. 6-1.D.

67.    When a lender reviews a loan file for quality control, the lender must, among other things, review and confirm specific pieces of information. For instance,"[d]ocuments

contained in the loan file should be checked for sufficiency and subjected to written reverification. Examples of items that must be reverified include, but are not limited to, the mortgagor[']s employment or other income, deposits, gift letters, alternate credit sources, and other sources of funds." HUD Handbook 4060.1, REV-2, ch. 7-6.E.2.; *see also* HUD Handbook 4700.2 REV-1, ch. 6-3.A.2.

68.    If the lender finds discrepancies, it must explore them to ensure that there are no deficiencies. "Any discrepancies must be explored to ensure that the original documents . . . were completed before being signed, were as represented, were not handled by interested third parties and that all corrections were proper and initialed." HUD Handbook 4060.1, REV-2, ch. 7-6.E.2.

69.    At the end of the quality control review, the lender is expected to assess the significance of any deficiencies. The HUD Handbook recommends a "system of evaluating each Quality Control sample on the basis of the severity of the violations found during the review. The system should enable a mortgagee to compare one month[']s sample to previous samples so the mortgagee may conduct trend analysis." HUD Handbook 4060.1, REV-2, ch. 7-4.

70.    HUD recommends four types of ratings. The ratings provided for this purpose are:

- "Low Risk", i.e., no problems or minor problems were identified with loan servicing or origination;
- "Acceptable Risk," i.e., the issues identified were not material to the "creditworthiness, collateral security or insurability of the loan";
- "Moderate Risk," i.e., a failure to address significant unresolved questions or missing documentation has created moderate risk for the mortgagee and the FHA; and
- "Material Risk," i.e. the issues identified were "material violations of FHA or mortgagee requirements and represent an unacceptable level of risk."

71.     Examples of "material risk" are violations that include a "significant miscalculation of the insurable mortgage amount or the applicant[']s capacity to repay, failure to underwrite an assumption or protect abandoned property from damage, or fraud." HUD Handbook 4060.1, REV-2, ch. 7-4.D.

72.     These findings trigger mandatory reporting obligations. Mortgagees "must report [Material Risk] loans, in writing," to HUD. *Id.*

73.     A lender is also required to report to HUD "[f]indings of fraud or other serious violations" that are discovered "during the normal course of business and by quality control staff during review/audits of FHA loans."  HUD Handbook 4060.1, REV-2., ch. 7-3.J.  The lender must report these findings, along with the supporting documentation, within 60 days of when the lender first discovers them. Id.; HUD Handbook 4060.1, REV-2, ch. 2-23 ("Mortgagees are required to report to HUD any fraud, illegal acts, irregularities or unethical practices."). Since November 2005, Direct Endorsement Lenders such as Gateway have been required to make such reports through HUD's online Neighborhood Watch Early Warning System. *See* Mortgagee Letter 2005-26.

74.     Internal reporting of findings is also required. Quality control review findings must "be reported to the mortgagee[']s senior management within one month of completion of the initial report" HUD Handbook 4060.1, REV-2, ch. 7-3.I.

75.     In addition to appropriate reporting, lenders must act to address the problems they identify.  "Management must take prompt action to deal appropriately with any material findings. The final report or an addendum must identify actions being taken, the timetable for their completion, and any planned follow-up activities." *Id.*; *see also* HUD Handbook

4700.2, REV-1, ch. 6-1.F.

*Certifications and Endorsements for FHA Insurance*

76.    HUD requires Direct Endorsement Lenders to certify their compliance with

the foregoing due diligence, quality control, and reporting requirements.

77.    First, when a lender applies to participate in the Direct Endorsement Lender

program and to endorse loans for FHA insurance on HUD's behalf, the lender must certify

that it will fully comply with all HUD guidelines, regulations, and requirements:

> I certify that, upon the submission of this application, and with its
> submission of each loan for insurance or request for insurance benefits,
> the applicant has and will comply with the requirements of the
> Secretary of Housing and Urban Development, which include, but are
> not limited to, the National Housing Act (12 U.S.C. § 1702 et seq.)
> and HUD's regulations, FHA handbooks, mortgagee letters, and Title I
> letters and policies with regard to using and maintaining its FHA lender
> approval.

78.    If the lender is approved, the lender must re-certify, every year, that it is

complying with the program's qualification requirements, including due diligence in

underwriting and the implementation of a mandatory quality control plan. As of 2010,

lenders are required to certify:

> I certify that I know, or am in the position to know, whether the
> operations of above-named lender conform to HUD-FHA regulations,
> handbooks, Mortgagee Letters, Title I Letters, and policies; and that I
> am authorized to execute this report on behalf of the lender. I certify
> that the lender complied with and agrees to continue to comply with
> HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters,
> policies, and terms of any agreements entered into with [HUD]. I
> certify that to the best of my knowledge, the above-named lender
> conforms to all HUD-FHA regulations necessary to maintain its HUD-
> FHA approval, and that the above-named lender is fully responsible for
> all actions of its principals, owners, officers, directors, managers,
> supervisors, loan processors, loan underwriters, loan originators, and all
> other employees conducting FHA business for the above-named lender .
> . . Each of my certifications is true and accurate to the best of my

knowledge and belief. I understand that if I knowingly have made any false, fictitious, or fraudulent statement(s), representation, or certification on this form, I may be subject to administrative, civil and/or criminal penalties; including debarment, fines, and imprisonment under applicable federal law.

79.    Unless the lender submits a truthful initial certification and annual certifications, the lender is not entitled to obtain or maintain its status as a Direct Endorsement Lender or to endorse loans for FHA insurance.

80.    In addition, for each individual mortgage loan approved for FHA insurance, the lender must make a "loan-level" certification—i.e., a certification specific to an individual loan—that the individual mortgage complies with HUD rules and is "eligible for HUD mortgage insurance under the Direct Endorsement program." Form HUD-92900-A.

81.    The "loan-level" certification differs depending on whether the lender used an AUS or manual underwriting. For each loan that was underwritten with an AUS, the lender must certify to "the integrity of the data supplied by the lender used to determine the quality of the loan [and] that a Direct Endorsement Underwriter reviewed the appraisal (if applicable)." *Id.* For each loan that required manual underwriting, the lender must certify that the Direct Endorsement Underwriter "personally reviewed the appraisal report (if applicable), credit application, and all associated documents and ha[s] used due diligence in underwriting th[e] mortgage." Id.

82.    For every loan that was approved by an FHA lender, whether through manual underwriting or the use of an AUS, an employee is required to certify:

I, the undersigned, as authorized representative of [the lender] at this time of closing of this mortgage loan, certify that I have personally reviewed the mortgage loan documents, closing statements, application for insurance endorsement, and all accompanying documents. I hereby make all certifications required for this mortgage as set forth in HUD

Handbook 4000.4.

83.    Absent the applicable certifications for an individual loan as described above, the Direct Endorsement Lender cannot endorse that loan for FHA insurance.

84.    Each of the foregoing certifications is material to HUD's payment of any claim submitted under the Direct Endorsement Lender Program. HUD does not review FHA loans for approval prior to the loan being endorsed for insurance or to paying claims in the event of a default; instead, it relies on its lenders to comply with HUD requirements and to ensure that every loan is in fact eligible for FHA insurance. The certifications are required for each lender to enter and remain in the program. The certifications are critical to HUD's ability to ensure that only qualified and eligible loans are endorsed for HUD insurance. The certifications are essential for a claim on a loan to be submitted for FHA insurance. And the certifications are needed to protect HUD and the FHA insurance fund from undue risk and loss.

### Defaulted Loans Result in Losses to HUD

85.    Once a loan is endorsed by HUD or the Direct Endorsement Lender, it is insured by FHA on the basis that that the Direct Endorsement Lender has followed the HUD requirements and has submitted accurate certifications and that the loan is eligible for FHA insurance. Without those requirements being met, the lender could not endorse the loan for FHA insurance. It is only because a lender endorses a loan for FHA insurance that the holder of the mortgage is able to submit a claim to HUD for any losses.

86.    If the borrower defaults, the holder of the mortgage can submit a claim to HUD for any loss from the default. The holder submits a claim for insurance by using HUD's electronic claim system. The claim must include certain information. Each loan that is

endorsed for FHA insurance has a unique FHA case number, and the claim must include the FHA case number. If a valid FHA case number is not submitted with the claim, an insurance payment will not be processed on that claim. The claim also must include the identification number of the mortgagee inputting the claim, which must be either the holder of record or the servicer of record of the mortgage.

87.     FHA pays these insurance claims in two parts. First, the mortgage holder makes an initial claim for the unpaid principal on the loan, plus interest. Second, if applicable, the mortgage holder later makes a final claim for expenses and allowances (e.g., foreclosure costs), plus interest. HUD Handbook 4330.4, REV-I, ch. 2-4.

88.     These claims are submitted to HUD electronically, and HUD's electronic system processes them automatically. The system ensures that the FHA insurance is active with respect to the FHA case number provided and that there are no other impediments (such as a no-pay flag or indemnification agreement) to paying the claim. After processing, the claim is approved for payment, and a disbursement request is sent to the United States Treasury to issue the funds via wire transfer to the holder of the mortgage note.

*Direct Endorsement Lenders Owe Duties to HUD By Virtue of Their Authority to Endorse Loans for FHA Insurance and Their Responsibility to Ensure Accuracy*

89.     HUD grants Direct Endorsement Lenders responsibility for determining which loans qualify for FHA insurance. In granting this control and responsibility to the Direct Endorsement Lenders, HUD must rely on and place trust and confidence in the lenders' knowledge, good faith, integrity, and candor. HUD therefore enters into a fiduciary relationship with the Direct Endorsement Lenders.

90.     As a result of this fiduciary relationship, the Direct Endorsement Lenders owe

HUD a duty to act with good faith, candor, honesty, integrity, fairness, and fidelity in their dealings with HUD. These duties require, among other things, that the lenders exercise integrity, prudence, candor, and due diligence on behalf of HUD when endorsing loans for FHA insurance, reviewing the loans for quality control purposes, reporting defective loans, and submitting claims.

91.    To become and remain a HUD-approved Direct Endorsement Lender, and to receive payment on claims for defaulted FHA-insured loans that it held, Gateway was required to annually certify its compliance with HUD's requirements.

92.    Upon information and belief, one of Gateway's officers or executives certified annually to HUD in sum or substance that:

> I know or am in the position to know, whether the operations of the above named mortgagee conform to HUD-FHA regulations, handbooks, and policies.  I certify that to the best of my knowledge, the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named mortgagee is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

93.    The foregoing certifications were knowingly false because, as discussed below, Gateway knew, deliberately ignored, or recklessly disregarded that it originated and underwrote loans that were not in compliance with HUD requirements.

## THE VA'S HOME LOAN GUARANTY PROGRAM

*Background*

94.    Pursuant to the Servicemen's Readjustment Act of 1944, the VA offers mortgage assistance through the VA Home Loan Guaranty Program. Through this program, the VA facilitates home ownership for veterans, active duty personnel, certain surviving spouses, and reservists (collectively, "veterans") by partially guaranteeing approved lenders

against losses on mortgage loans made to veterans.

95.     Like FHA loans, VA-guaranteed loans are made by private lenders, such as banks and mortgage companies. To obtain a VA loan, a veteran must apply to an approved lender ("VA Lender"). If the loan is approved, the VA will guarantee a portion of the loan, which protects the VA Lender against loss up to the amount guaranteed. The maximum amount that the VA guarantees is 50% of the loan. By partially guaranteeing loans against default, the VA loan guarantee encourages lenders to make loans to veterans, and makes the resulting loans valuable on the secondary market.

96.     Many VA Lenders, including Gateway, are authorized to underwrite mortgage loans, decide whether the borrower represents an acceptable credit risk for the VA, and approve loans for the VA guarantee without prior review or approval by the VA.

97.     To qualify for the VA guarantee, a mortgage must meet all of the applicable VA underwriting requirements. Much like the HUD underwriting requirements, the VA underwriting requirements relate to such things as the borrower's income and assets, the borrower's credit history, and the valuation of the subject property.

*VA Underwriting Due Diligence Requirements*

98.     In underwriting loans and evaluating whether to approve loans for the VA guarantee, VA Lenders are required to follow the VA's applicable underwriting guidelines. These guidelines are set forth in the VA Lenders' Handbook, *see* VA Pamphlet 26-7 at Ch. 4, and are incorporated into regulations at 38 C.F.R. § 36.4340. The VA's underwriting guidelines contain rules that must be followed to ensure that each borrower's "present and anticipated income and expenses, and credit history[,] are satisfactory" such that the borrower "is a satisfactory credit risk." 38 C.F.R. § 36.4340.

- 25 -

99.    The VA relies on VA Lenders to conduct due diligence on loans before approving them for the VA guarantee. *See id.* § 36.4340(j). To satisfy this due diligence requirement, VA Lenders must, among other things, develop all credit information; obtain all required verifications and a credit report; ensure the accuracy of all information on which the loan decision is based; and comply with all of the applicable VA underwriting guidelines. *Id.; see* VA Pamphlet 26-7 at 4-3; VA Form 26-1820.

### *VA Individual Loan Certifications*

100.    For each loan that a VA Lender approves for the VA guarantee or refinancing, the lender must certify that it conducted due diligence to ensure that the mortgage complies with the applicable VA underwriting rules. *See* 38 C.F.R. § 36.4340(k). Pursuant to VA regulations, each loan approved for the VA guarantee or refinancing incorporates the following certification:

> The undersigned lender certifies that the (loan) (assumption) application, all verifications of employment, deposit, and other income and credit verification documents have been processed in compliance with 38 CFR part 36; that all credit reports obtained or generated in connection with the processing of this borrower's (loan) (assumption) application have been provided to VA; that, to the best of the undersigned lender's knowledge and belief the (loan) (assumption) meets the underwriting standards recited in chapter 37 of title 38 United States Code and 38 CFR part 36; and that all information provided in support of this (loan) (assumption) is true, complete and accurate to the best of the undersigned lender's knowledge and belief.

*Id.* at § 36.4340(k)(2)(i).

101.    Additionally, for each loan that a VA Lender approves for the VA guarantee or refinancing, the lender must execute VA Form 26-1820, pursuant to which it further certifies, among other things, that "[t]he loan conforms with the applicable provisions of Title 38, U.S. Code, and the Regulations concerning guaranty or insurance of loans to veterans."

102.    Absent a truthful individual loan certification, a VA Lender is not permitted to approve a loan for the VA guarantee.

## GATEWAY'S SCHEME TO DEFRAUD THE GOVERNMENT THROUGH DELIBERATELY AND RECKLESSLY APPROVING INELIGIBLE GOVERNMENT LOANS

103.    During the relevant time period, Gateway underwrote loans it knew did not comply with FHA and VA loan requirements and knowingly and falsely certified to HUD and the VA that it (1) used due diligence in underwriting the loans; or (2) that the data it used to approve the loans for government insurance had integrity and that the loans were eligible for FHA or VA mortgage insurance.

104.    Gateway commonly utilized several tactics to approve ineligible loans.  This included Gateway instructing employees to "make it work" by intentionally miscalculating or misrepresenting borrowers' income or debt obligations, manipulating the AUS/TOTAL system to predetermine the financial data points necessary to get an "Accept/Approve" rating, and ignoring warning signs of fraud.

105.    As described below, Gateway knew, deliberately ignored, and recklessly disregarded the fact that many of its loans did not comply with the FHA's and VA's underwriting requirements, and thus were not eligible for FHA or VA mortgage insurance.

106.    Furthermore, Gateway established certain underwriting processes that it knew, deliberately ignored, or recklessly disregarded would result in Gateway endorsing materially defective loans for FHA mortgage insurance.

### *Gateway's Pressure on Underwriters to Approve Ineligible Loans*

107.    As part of its scheme to approve as many FHA and VA loans as possible, Gateway established a culture that valued getting a loan approved and endorsed for FHA and

VA insurance over compliance with the government's rules.

108.   Gateway's goal was to approve virtually every FHA and VA loan that it was presented, even if those loans did not meet FHA or VA guidelines to qualify for insurance. Gateway's management stressed that if it appeared that a loan would not meet the FHA or VA requirements, underwriters merely needed to look harder at the file and "make it work."

109.   To do so, Gateway created a management exception process that allowed its underwriters to request management approval for an exception to underwriting requirements that could not be met. As part of this process, Gateway routinely granted management exceptions to allow violations of the FHA and VA underwriting requirements. Gateway certified that each loan complied with the government's requirements, even when Gateway knew these loans did not.

110.   Gateway's senior management was aware of the management exception process, and was often involved in the decision of whether to grant an exception requested by an underwriter.

111.   Gateway's formalized acceptance and approval of management exceptions caused underwriters to view the FHA's and VA's rules and requirements as mere suggestions that could be disregarded in order to close a loan.

112.   Additionally, if an underwriter refused to approve a particular loan file because it did not meet the FHA requirements, Gateway would often send these loans to a few of its preferred underwriters who it knew were unlikely to follow the guidelines and would approve almost any loan.

113.   Even though the first underwriter had declined the loan, this second underwriter would subsequently approve the loan, despite the fact that the underlying

documentation and numbers were exactly the same that the first underwriter had used.

114.    Under this system, Gateway's underwriters were expressly encouraged to push through as many loans as possible, with little regard for FHA and VA requirements.

*Gateway Manipulated the AUS/TOTAL System to Predetermine Values That It Knew Would Generate "Accept/Approve" Ratings*

115.    As part of its scheme to approve every FHA loan that it was presented, Gateway instructed employees to systemically manipulate the data that was entered into Gateway's AUS/TOTAL system to determine variables that would lead to an "Accept/Approve" rating from TOTAL.

116.    As discussed above, loans that receive an "Accept/Approve" rating in the AUS/TOTAL system are subject to significantly less documentation requirements and scrutiny than loans that receive a "Refer" rating and must be manually underwritten.

117.    In order to avoid additional documentation and loan scrutiny that "Refer" ratings require, Gateway schemed to defraud HUD by predetermining data variables that would result in an "Accept/Approve" rating.

118.    When a Gateway employee (typically a Mortgage Loan Officer) initially ran a loan through Gateway's AUS/TOTAL, he or she would enter variable amounts consistent with the borrower's representations and/or the documents in the loan file. However, if a loan received a "Refer" rating, Gateway employees would isolate one or more variables, including most commonly the borrower's income or monthly debt obligations.

119.    Gateway employees would then systematically increase or decrease the variable over a short period of time to identify an amount that would result in an "Accept/Approve" rating.

120.   As an example, Gateway's employees would repeatedly enter different income amounts, gradually increasing the amounts until an "Accept/Approve" rating was achieved in AUS/TOTAL.

121.   Once an employee determined the minimum qualifying amount of income, Gateway's employees would use impermissible calculations of income in order to meet the qualifying amount determined by AUS/TOTAL.  Gateway's management referred to these improper calculations as ways to "push the income."

122.   Relator is aware that Gateway would manipulate the AUS/TOTAL system several times before determining financial variables that could be used to qualify a borrower for a loan on an "Accept/Approve" basis.

123.   Relator is aware that Gateway would frequently run loans multiple times in the AUS/TOTAL system using these tactics.

### Examples of Gateway's Impermissible and Fraudulent Certification of Non-Compliant FHA Loans

124.   Gateway's false certifications, as well as its reckless, negligent, and grossly negligent conduct in violation of the FHA standards and requirements, violated Gateway's fiduciary obligations and duty of care to HUD.

125.   As set forth above, the FHA program requires a lender to represent that the underwriting conditions are met for all loans processed through the lender's system.

126.   As part of both the annual certifications and individual loan certifications, Gateway certified that they complied with the required level of quality control and duty of care.  For example, Gateway underwrote mortgages using the AUS system, and verified that all of the AUS conditions were satisfied, the loans complied with all HUD requirements, and

that the loans were eligible for FHA insurance.

127.   Contrary to these certifications, Gateway did not comply with the HUD requirements for approval of the loan.  Gateway ignored obvious red flags and signs of fraud in reviewing income documentation.

128.   Underwriters were repeatedly told by Defendants' management to "make it work" as part of the underwriting process.  This meant that if a loan did not qualify for government insurance, the underwriters should use impermissible ways to perform important calculations and to overlook regulations and requirements when it meant that doing so would allow a file to be approved.  The emphasis was not on finding a way to make the most appropriate decision, but instead to rapidly find any way to get a file approved.

129.   For instance, HUD underwriting guidelines state that to verify and document a borrower's income, the lender must obtain a Verification of Employment, the borrower's most recent paystubs, and the borrower's IRS W-2 forms for the two most recent years.

130.   As an alternative to obtaining a written Verification of Employment, a lender may  verify employment with an employer by telephone provided that the employee provides the required W-2s and paystubs.  To do so, HUD Handbook 4155.1 1.B.2.e requires lenders to verify current employment by telephone, and to record the name of the person who verified employment on behalf of the employer.

131.   Despite this clear requirement, Gateway routinely failed to contact employers to verify the borrower's employment.  If Gateway had, Gateway likely would have sometimes realized that the borrower was not an employee of the company, was actually self-employed, or would have learned about serious discrepancies in the borrower's reported income.

132.   As another example of intentionally miscalculating a borrower's income,

Gateway also instructed underwriting staff to miscalculate income using impermissible calculations related to bonuses and overtime.

133.   Under HUD Handbook 4155.1 4.D.2.b, overtime and bonuses can be used in calculating an individual's annual income if a borrower has received that income for the past two years and it is likely to continue.   Additionally, the lender must establish that the overtime and bonus income are likely to continue.   If either type of income shows a continual decline, lenders are required to document in writing the reasons for such a decline.

134.   Despite these requirements, Gateway routinely used impermissible income calculations related to bonuses and overtime.   For example, Relator recalls that Gateway's management would use bonuses and overtime as a way to "make it work" and reach certain income requirements that Gateway had found the TOTAL system would rate as "Accept/Approve."

135.   However, the bonus and overtime of these borrowers would often be for less than a two-year period or would wildly fluctuate between years.

136.   Relator specifically recalls that Gateway instructed underwriting staff to manipulate the income of nurses, who would have large fluctuations in income throughout the year based on the amount of overtime they worked in a particular week.   If Gateway needed to "make it work," it would have underwriters take a nurse's paystub in a period that they worked significant overtime (and thus had more income than normal) and would improperly extrapolate that income to a yearly salary.

137.   In other circumstances, Gateway would not average a borrower's bonuses or income over a two year period, but and instead would exclude the income of the lower year and pretend that the same amount was earned in the other year.

138. Gateway failed to otherwise justify the reasons for using the income that it did, and Gateway's management instructed employees to deliberately miscalculate the income in order to "push income" to the levels that Gateway needed for AUS/TOTAL approval.

139. Gateway's entry of a monthly debt obligations variable into its AUS/TOTAL that lacked integrity is another example of the multiple rules that Gateway violated in approving loans for FHA insurance.

140. Under the applicable HUD rules, HUD Handbook 4155.1 4.C.3.c, the total debt-to-income ratio may not exceed 43% and the payment-to-income ratio may not exceed 31% unless "significant compensating factors" are present.

141. Contrary to this requirement, Gateway failed to document adequate compensating factors even though the borrower's debt-to-income and payment-to-income ratios exceeded the maximum allowable amounts. By doing so, Gateway failed to sufficiently analyze the borrower's ability to support the monthly mortgage payments.

142. As an example of "making it work" in this regard, Gateway would make impermissible calculations regarding a borrower's income or debt obligations, such as ignoring monthly debts that should have been included in the calculation, in order to keep loans under the 43% or 31% thresholds.

143. Gateway's false certifications that loans complied with HUD's rules on permissible debt-to-income and payment-to-income ratios were material and bore upon the loan's eligibility for FHA insurance and the likelihood that the borrower would make mortgage payments.

144. Gateway also exceeded HUD's maximum loan-to-value ratio of 85% and improperly used identity-of-interest transactions to approve loans in excess of the 85%

threshold.

145.   Under HUD Handbook 4155.1 2.B.2.c, where the seller and borrower have an identity of interest (e.g. a family member, builder's employee purchase, or a landlord-tenant relationship), the loan-to-value ratio generally cannot exceed 85%. There is an exception to this rule, but the exception applies only if the borrower is a tenant who has lived in the subject property for at least six months prior to closing.

146.   Despite this requirement, Gateway improperly approved loans above the 85% loan-to-value threshold, even though the borrower's documentation showed that the borrower had been a tenant of the landlord-seller for fewer than six months. In many instances, the loan file would also not contain canceled rent checks for six months that would confirm that the borrower lived there for six months.

147.   Further contrary to HUD's requirements, Gateway also failed to properly verify and obtain appropriate documentation related to borrowers' assets used for down payments.

148.   Under the FHA's program, borrowers are typically required to make a minimum down payment of 3.5% of the purchase price. However, borrowers with low credit scores may be required to make a down payment in excess of 3.5%.

149.   With respect to down payments, Gateway instructed its underwriting staff to ignore warning signs that a borrower's assets included funds that were not the borrower's.

150.   For example, borrowers would frequently claim that they had the required down payment funds in a checking or savings account. However, when Gateway's underwriters reviewed bank deposit information, it often revealed that the requisite funds had recently been provided by a person other than the borrower (such as a family member).

These are commonly referred to as "gift funds."

151.    Specifically HUD Handbook 4155.1 5.B.5 requires that, in order to ensure that gift funds are not provided by a party to the sales transaction, FHA lenders must document gift funds with a gift letter, signed by the borrower, that specifies the amount of the gift, specifies that the funds are a gift requiring no repayment, and there must be documentation of the transfer of the funds from the donor to the borrower.

152.    Additionally, HUD Handbook 4155.1 5.B.2.b requires that a verification of deposit, along with recent bank statements to be used to verify savings and checking accounts.  If there is a large increase in the account, lenders are also required to obtain a credible explanation from the borrowers as to the source of the funds.

153.    Despite these requirements, Gateway encouraged its underwriters to ignore instances in which borrowers had recent and significant deposits into their checking and savings accounts, and to instead treat the funds as if they had long existed in the borrowers' accounts.  This is extremely problematic because if such funds were from an improper source (such as the seller) or if the funds were not in fact a gift, this would substantially increase the likelihood that the buyer could not meet the loan's monthly mortgage payments and the loan would be declined.

154.    Gateway also improperly allowed loans to be approved in situations where the borrower got their entire Earnest Money Deposit back at closing.  Therefore, instead of making the required down payment, the borrower actually had no investment in the property.

155.    As part of its improper calculation of borrowers' assets, Gateway also failed to use current documents in analyzing a borrower's assets.

156.   Under HUD Handbook 4155.1 1.B.1.h, lenders are prohibited from relying on stale documents in underwriting a loan, and may not use documents related to asset verification that are over 120 days old when the loan closes.

157.   Notwithstanding this rule, Gateway relied on documents that were more than 120 days old to verify the borrower's assets.   The documents were stale, and thus were unreliable and unacceptable as a basis to verify assets.

158.   Gateway also failed to properly review the creditworthiness of borrowers. HUD underwriting guidelines state that lenders must analyze a borrower's credit and determine the creditworthiness of the applicant.   Specifically, lenders must verify and analyze the borrower's payment history of housing obligations, and obtain written explanations from the borrower of past derogatory credit.   HUD Handbook 4155.1 4.C.2.b; 4.C.1.c.

159.   Contrary to this rule, Gateway failed to verify borrowers' histories of housing obligations and failed to obtain explanations from borrowers for past derogatory credit.

160.   Gateway's violation of the above rules and regulations resulted in Gateway making false certifications that the loans it certified for FHA insurance complied with HUD's rules.

161.   Gateway's false certifications that loans complied with HUD's rules and regulations described above were material and bore upon the loan's eligibility for FHA insurance and the likelihood that the borrower would make mortgage payments.

*Gateway's Reckless Underwriting Extended to its VA Loan Practices*

162.   As with FHA loans, for each loan that Gateway approved for the VA guarantee, it was required to certify that it had conducted due diligence to ensure that the loan satisfied the VA's underwriting guidelines.   *See* 38 C.F.R. § 36.4340(k); VA Form 26-1820.

163.   Relator is aware that Gateway's VA loans suffered from the same types of defects that the FHA loans had, such as containing documentation that was internally inconsistent, making impermissible calculations, and not the proper documentation, or that otherwise did not meet the requirements of the VA's underwriting guidelines.

164.   In committing such violations, Gateway approved loans for VA insurance without performing the proper due diligence and/or recklessly performed its underwriting obligations.

165.   Gateway's false certifications that loans complied with the VA's rules and regulations described above were material and bore upon the loan's eligibility for VA insurance and the likelihood that the borrower would make mortgage payments.

### Gateway Failed to Maintain Quality Control Procedures as Required by HUD's Direct Endorsement Lender Program

166.   Gateway also failed to comply with HUD's rules and regulations regarding required quality control procedures, even though those procedures were mandatory for Gateway's maintenance of its Direct Endorsement Lender status.   Instead, Gateway made false representations to HUD about Gateway's purported compliance with HUD's rules pertaining to quality control procedures.

167.   At all relevant times, Gateway was required to file annual certifications with HUD to maintain its Direct Endorsement Lender status.

168.   Upon information and belief, as part of those annual certifications, Gateway falsely certified that it had quality control procedures.   In fact, Gateway did not implement quality control procedure and a quality control department until approximately 2013.

169.   Until approximately 2013, Gateway signed and submitted the annual

certification despite not having the required quality controls in place and thus: (i) intentionally lied to HUD; (ii) consciously avoided learning whether the certification was true or false; (iii) recklessly disregarded whether the certification was true or false; and/or (iv) were negligent and determining whether the certification was true or false.

170.    Contrary to the representations made in the annual certifications prior to 2013, Gateway failed to implement and maintain basic quality control requirements.  These violations were not technical or innocent, but knowing, material, and substantial.

171.    In order to obtain and maintain Direct Endorsement Lender status, a lender is required to continuously implement a quality control program that is independent of its business operations.  Independence ensures that the quality control department brings its own judgment to bear in assessing the validity of loans previously made, without concern for meeting a targeted volume of business.

172.    Upon information and belief, Relator is aware that prior to 2013, Gateway chose not to utilize a quality control department and no employees were exclusively assigned to quality control.  Even in the instances where Gateway may have had some loans reviewed or audited, Gateway did not consistently review loans nor did Gateway report to HUD findings of fraud and other serious violations, despite a HUD requirement that all such findings be reported within 60 days.

173.    Gateway deliberately avoided its quality control requirements because it viewed quality control as a detriment to loan production.  Instead of implementing quality control procedures, Gateway emphasized speed and volume and an overall focus on getting as many loans approved as possible.  Gateway sought to have virtually all employees perform underwriting and origination duties, while few, if any, employees were tasked with quality

control. This in turn resulted in loans that were likely to have significant errors.

174.   As part of its failure to maintain a proper quality control system, Gateway also failed to provide underwriting staff with training and feedback on underwriting errors. For example, although Relator is aware that Gateway had government loans with significant errors, Gateway failed to take any substantive steps to provide training and corrective measures to address these errors.

175.   Gateway also failed to provide its underwriting staff with the updated rules and regulations pertaining to the government lending programs and instead only provided its own, outdated overlays to underwriters.

176.   As a result of failing to implement quality control procedures, Gateway also failed to identify systemic fraudulent practices, such as brokers paying Gateway's underwriters $100 to approve their loans.

177.   Upon information and belief, until approximately 2013, Gateway also failed to review all early payment defaults as required by HUD rules.

178.   In light of Gateway's serious and material defects in its quality control program, until 2013 Gateway could not truthfully complete the annual certification that it maintained a sufficient quality control program and thus falsely certified to HUD that it was able to participate in the Direct Endorsement Lender program.

### Gateway's Improper Underwriting Practices Result in False Certifications and False Claims

179.   The examples discussed in this Complaint are representative examples of the systemic practices and procedures followed by Gateway that led to the submission of false statements and claims.

180.   Upon information and belief, HUD and the VA paid all of the claims for loans

that were falsely certified as eligible for FHA and VA insurance.  These claims were false because the loans were not eligible for government insurance, and Gateway falsely certified to the integrity of the data that was used to approve the loan for government insurance and its compliance with the government's requirements.

181.   Gateway falsely certified that the statements made in the application for insurance were true and accurate and that all conditions had been satisfied.  The mortgages did not qualify for FHA or VA insurance because they were not underwritten in accordance with the government guidelines, Gateway had not used due diligence in underwriting them, and/or Gateway used data that lacked integrity.

182.   Gateway violated HUD and VA requirements and falsely certified to compliance with those requirements.  Gateway was therefore not authorized to endorse these mortgage loans for FHA or VA insurance.  Gateway's false certifications and violations of the government requirements bore upon the likelihood of whether the borrower would make mortgage payments.

183.   Upon information and belief, as a result of this conduct, Gateway submitted or caused the submission of hundreds of false claims.

### FIRST CAUSE OF ACTION
#### *For Damages and Penalties Under the False Claims Act*
31 U.S.C. § 3729(a)(1)(B)

184.   The United States repeats and realleges the allegations above as if fully set forth herein.

185.   Gateway violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, false records, or statements: (i) material to false or fraudulent claims for payment to HUD; and/or (ii) in order

to get false or fraudulent claims paid; and (iii) which claims the United States did pay.

186.    The United States paid the false or fraudulent claims because of Gateway's acts and incurred damages as a result.

**WHEREFORE, Relator, on behalf of herself and the United States Government, requests the following relief:**

a.    A judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained as a result of Defendant's violations of the False Claims Act;

b.    A judgment against Defendant for a civil penalty of $11,000 for each of Defendant's violations of the False Claims Act;

c.    That Relator recover all costs of this action, with interest, including the cost to the United States Government for its expenses related to this action;

d.    That Relator be awarded all reasonable attorneys' fees in bringing this action;

e.    That in the event the United States Government proceeds with this action, Relator be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the action;

f.    That in the event the United States Government does not proceed with this action, Relator be awarded an amount for bringing this action of at least 25% but not more than 30% of the proceeds of the action;

g.    That a trial by jury be held on all issues so triable;

h.    An award of pre-judgment interest; and

i.    Such other relief to Relator and/or the United States of America as this Court may deem just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL.**

Dated: June 23, 2016

**THOMAS & SOLOMON LLP**

By: _____

Patrick J. Solomon, Esq.
Jonathan W. Ferris, Esq.
*Attorneys for Relator*
693 East Avenue
Rochester, New York 14607
Telephone:  (585) 272-0540
psolomon@ theemploymentattorneys.com
jferris@theemploymentattorneys.com